**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

SANDRA CARLSON and MARJORIE CUMMINGS,   :
on Behalf of Themselves and All Others Similarly   :
Situated,   :    **Electronically Filed**

  :

                   Plaintiffs,   :

  :    Index No. CV-04-3086 (LDW)(ARL)

        v.   :

  :

LONG ISLAND JEWISH MEDICAL CENTER,   :
NORTH SHORE UNIVERSITY HOSPITAL IN   :
MANHASSET, NORTH SHORE-LONG ISLAND   :
JEWISH HEALTH SYSTEM, INC., AMERICAN   :
HOSPITAL ASSOCIATION, AND JOHN DOES 1-10,   :

  :

              Defendants.   :

------------------------------------------------------------------------ x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT NORTH SHORE-LONG ISLAND JEWISH HEALTH SYSTEM, INC., LONG ISLAND JEWISH MEDICAL CENTER AND NORTH SHORE UNIVERSITY HOSPITAL IN MANHASSET'S MOTION TO DISMISS THE COMPLAINT

**BERNSTEIN LIEBHARD & LIFSHITZ LLP**
Keith M. Fleischman (KF-0199)
Robert J. Berg (RB-8542)
Ronald J. Aranoff (RA-4690)
Brian S. Cohen (BC-2091)
10 East 40th Street
New York, NY 10016
Tel: (212) 779-1414
Attorneys for Plaintiff and the Class

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ i

ARGUMENT ......................................................................................................................4

I.   PLAINTIFFS' THIRD PARTY BENEFICIARY CLAIM IS WELL PLED ................4

    A.   The 501(c)(3) Tax Exemption Creates A Contract with the United States ...........4

    B.   Plaintiffs Have Standing To Sue................................................................8

    C.   Plaintiffs Are Intended Third Party Beneficiaries Of The Contract
        Between Defendants And The United States...........................................11

II.   PLAINTIFFS STATE A CLAIM UNDER THE FEDERAL FAIR DEBT
    COLLECTIONS PRACTICES ACT................................................................14

III.  PLAINTIFFS' STATE LAW CONTRACT CLAIMS ARE WELL PLED.................15

    A.   Plaintiffs' Breach of Contract Claim Is Well Pled..................................15

    B.   Plaintiffs' Unjust Enrichment/Constructive Trust Claim Is Well Pled...............19

IV.  PLAINTIFFS' GBL § 349 CLAIM IS WELL PLED.......................................21

V.   PLAINTIFFS' CHARITABLE TRUST CLAIM IS WELL PLED ..............................23

VI.  PLAINTIFFS' CLAIMS AGAINST SYSTEM ARE WELL PLED.............................24

VII. INJUNCTIVE AND DECLARATORY RELIEF ARE APPROPRIATE ...................25

VIII.PLAINTIFFS' CIVIL CONSPIRACY/CONCERT OF ACTION CLAIM.................25

CONCLUSION ................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.,*
305 A.D.2d 340, 759 N.Y.S.2d 149 (2d Dep't 2003)................................................17

*Albany Med. Ctr. Hosp. v. Huberty,*
76 A.D.2d 949, 428 N.Y.S.2d 746 (3d Dep't 1980)................................................17

*Allen v. Wright,*
468 U.S. 737 (1984).........................................................................................9

*Bauer v. Mellon Mortgage* Co.,
680 N.Y.S.2d 397, 178 Misc. 2d 234 (Sup. Ct., N.Y. Cty. 1998) ...........................22

*Bob Jones Univ. v. U.S.,*
461 U.S. 574 (1983)..........................................................................................4

*Brian A. v. Sundquist,*
2000 U.S. Dist. LEXIS 21070 (M.D. Tenn. Oct. 24, 2000) ....................................12

*Brogdon v. Nat'l Healthcare Corp.,*
103 F. Supp. 2d 1322 (N.D. Ga. 2000) .................................................................13

*Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.,*
2000 U.S. Dist. LEXIS 22130 (S.D.N.Y. Aug. 31, 2000) ......................................25

*Carvel Corp. v. Noonan,*
2004 N.Y. LEXIS 2415 (Oct. 14, 2004) ...............................................................18

*City of Huntsville v. City of Madison,*
24 F.3d 169 (11th Cir. 1994) .............................................................................13

*Clinton v. City of N.Y.,*
524 U.S. 417 (1998)...........................................................................................9

*Cmty. Action v. James Archer Smith Hosp.,*
325 F. Supp. 268 (S.D. Fla. 1971) ......................................................................10

*Cook v. Ochsner Found. Hosp.,*
319 F. Supp. 603 (E.D. La. 1970), *aff'd,*
559 F.2d 968 (1977)..........................................................................................10

*Cort v. Ash,*
    422 U.S. 66 (1975)...............................................................................................13

*Corum v. Beth Israel Med. Ctr.,*
    359 F. Supp. 909 (S.D.N.Y. 1973) .................................................................6, 10

*Counihan v. Allstate Ins. Co.,*
    194 F.3d 357 (2d Cir. 1999)......................................................................... 20-21

*Counihan v. Allstate Ins. Co.,*
    907 F. Supp. 54 (E.D.N.Y. 1995) ....................................................................20

*Crowe v. Coleman,*
    113 F.3d 1536 (11th Cir. 1997) .......................................................................25

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.,*
    941 F.2d 1220 (D.C. Cir. 1991)........................................................................13

*Davis v. Bryan,*
    810 F.2d 42 (2d Cir. 1987)..........................................................................13, 18

*Designers North Carpet, Inc. v. Mohawk Indus., Inc.,*
    153 F. Supp. 2d 193 (E.D.N.Y. 2001) .............................................................16

*Dillon v. V-A Columbia Cablevision of Westchester, Inc.,*
    292 A.D.2d 25, 740 N.Y.S.2d 396 (2d Dep't 2002).................................... 18-19

*Duffy v. Birmingham,*
    190 F.2d 738 (8th Cir. 1951) ..............................................................................5

*Epstein v. Haas Sec. Corp.,*
    731 F. Supp. 1166 (S.D.N.Y. 1990)..................................................................15

*Euresti v. Stenner,*
    458 F.2d 1115 (10th Cir. 1972) ...............................................................6, 10, 13

*Fed'n Pharm. Serv., Inc. v. Comm'r,*
    72 T.C. 687, (1979), *aff'd,*
    625 F.2d 804 (8th Cir. 1980) ..............................................................................5

*Flagstaff Med. Ctr. v. Sullivan,*
    962 F.2d 879 (9th Cir. 1992) ..............................................................................9

*Flushing Hosp. & Med. Ctr. V. Woytisek,*
    41 N.Y.2d 1081 (1977) .....................................................................................17

*Fulani v. Bentsen,*
  35 F.3d 49 (2d Cir. 1994)..................................................................................9

*Garcia v. Presbyterian Hosp. Ctr.,*
  92 N.M. 652, 593 P.2d 487 (N.M. Ct. App. 1979) ................................17

*Geisinger Health Plan v. Comm'n. Internal Rev. Serv.,*
  985 F. 2d 1210 (3rd Cir. 1993) ..........................................................7

*Glass v. U.S.,*
  258 F.3d 1349 (Fed. Cir. 2001)..........................................................12

*Golden Pac. Bancorp v. FDIC,*
  273 F.3d 509 (2d Cir. 2001)..............................................................19

*Growchowski v. Phoenix Constr.,*
  318 F.3d 80 (2d Cir. 2003)................................................................12

*Haswell v. U.S.,*
  500 F.2d 1133 (Ct. Cl. 1974) ............................................................7

*Higgs v. Carver,*
  286 F.3d 437 (7th Cir. 2002) ........................................................11, 16

*Houbigant, Inc. v. Dev. Specialists, Inc.,*
  229 F. Supp. 2d 208 (S.D.N.Y. 2002)................................................18

*Huntington Hosp. v. Abrandt,*
  4 Misc. 3d 1, 2, 779 N.Y.S.2d 891 (2d Dep't 2004) .............................17

*IHC Health Plans Inc. v. Comm'r of Internal Revenue,*
  325 F.3d 1188 (10th Cir. 2003) ..........................................................7

*In re Initial Pub. Offering Sec. Litig.,*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................................................11

*In re United States Catholic Conference,*
  885 F.2d 1929 (2d Cir. 1989)..............................................................9

*John Muir Mem'l Hosp. v. Davis,*
  559 F. Supp. 1042 (N.D. Cal. 1983) ....................................................10

*Klamath Water Users Protection Ass'n v. Patterson,*
  204 F.3d 1206 (9th Cir. 1999) ............................................................13

*Komanoff v. Mabon, Nugent & Co.,*
    884 F. Supp. 848 (S.D.N.Y. 1995) .................................................................................13

*Kurowski v. Bridgeport,*
    1988 U.S. Dist. LEXIS 2239 (D. Conn. Feb. 19, 1988) ........................................................18

*Lamar Adver. of Penn, LLC v. Town of Orchard Park,*
    356 F.3d 365 (2d Cir. 2004)....................................................................................................8

*Lefkowitz v. Cornell Univ.,*
    35 A.D.2d 166, 316 N.Y.S.2d 264 (4th Dep't 1970), *aff'd,*
    28 N.Y.2d 876 (1971) ...........................................................................................................23

*Linens of Europe, Inc. v. Best Mfg.,*
    2004 U.S. Dist. LEXIS 18575 (S.D.N.Y. Sept. 15, 2004)......................................................21

*Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n,*
    743 F. Supp. 176 (S.D.N.Y. 1990) ........................................................................................20

*Maalouf v. Salomon Smith Barney, Inc.,*
    2003 U.S. Dist. LEXIS 5913 (S.D.N.Y. Apr. 9, 2003)......................................................19-20

*Maguire v. CitiCorp Retail Serv., Inc.,*
    147 F.3d 232 (2d Cir. 1998)..................................................................................................14

*Mathews v. Kilroe,*
    170 F. Supp. 416 (S.D.N.Y. 1959) ........................................................................................25

*Mayes v. Local 106, Int'l Union of Operating Eng'rs,*
    739 F. Supp. 744 (N.D.N.Y. 1990)........................................................................................16

*McHenry v. Renne,*
    84 F.3d 1172 (9th Cir. 1996) .................................................................................................16

*McKinnon v. International Fidelity Ins. Co.,*
    704 N.Y.S.2d 774 (Sup. Ct., N.Y. Cty. 1999) .......................................................................22

*McNeill v. N.Y. City Hous. Auth.,*
    719 F. Supp. 233 (S.D.N.Y. 1989) ........................................................................................11

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Young,*
    1994 U.S. Dist. LEXIS 2929 (S.D.N.Y. 1994)......................................................................25

*Miree v. DeKalb County, Ga.,*
    433 U.S. 25 (1977)................................................................................................................12

*Montana v. United States,*
   124 F.3d 1269 (Fed.Cir.1997)............................................................................................12, 13

*Mulvihill v. Julia L. Butterfield Mem'l Hosp.,*
   329 F. Supp. 1020 (S.D.N.Y. 1971).........................................................................................9

*N.Y. City Coalition for Cmty. Health v. Lindsay,*
   362 F. Supp. 434 (S.D.N.Y. 1973) ........................................................................................10

*Negrin v. Norwest Mortgage, Inc.,*
   263 A.D.2d 39, 700 N.Y.S.2d 184 (2d Dep't 1999).............................................................22

*Oppedahl & Larson v. Network Solutions,*
   3 F. Supp. 2d 1147 (D. Colo. 1998)......................................................................................13

*Penn v. San Juan Hospital, Inc.,*
   528 F.2d 1181 (10th Cir. 1975) ............................................................................................10

*Peters v. Amoco Oil Co.,*
   57 F. Supp. 2d 1268 (M.D. Ala. 1999) ................................................................................25

*Pilot Air Freight Corp. v. City of Buffalo,*
   1991 U.S. Dist. LEXIS 18600 (W.D.N.Y. Dec. 16, 1991).....................................................12

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.,*
   893 F. Supp. 285 (S.D.N.Y. 1995) .......................................................................................17

*RIJ Pharm. Corp. v. Ivax Pharms., Inc.,*
   322 F. Supp. 2d 406 (S.D.N.Y. 2004)...................................................................................16

*Saine v. Hosp. Auth. of Hall County,*
   502 F.2d 1033 (5th Cir. 1974) ...............................................................................................9

*Scott v. Fairbanks Capital Corp.,*
   284 F. Supp. 2d 880 (S.D. Ohio 2003) .................................................................................19

*Selman v. Harvard Med. Sch.,*
   494 F. Supp. 603 (S.D.N.Y.),
   *aff'd* 636 F.2d 1204 (2d Cir. 1980) .......................................................................................9

*Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   465 F. Supp. 1233 (S.D.N.Y. 1979)......................................................................................13

*Sierra Rutile Ltd. v. Katz,*
   1992 U.S. Dist. LEXIS 13518 (S.D.N.Y. Sept. 9, 1992).......................................................18

*Simon v. Eastern Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976)............................................................................................................10, 23

*Sonora Cmty. Hosp. v. Comm'r,*
    46 T.Ct. 519 (1966)...................................................................................................................7

*St. David's Health Care Sys., Inc. v. U.S.,*
    2002 U.S. Dist. LEXIS 10453 (W.D. Tex. Jun. 7, 2002) .......................................................7

*Steinmetz v. Toyota Motor Credit Corp.,*
    963 F. Supp. 1294, 1306 (S.D.N.Y. 1997)............................................................................21

*Sterling v. Ackerman,*
    244 A.D.2d 170, 663 N.Y.S.2d 842 (1st Dep't 1997)............................................................21

*Sullivan v. Syracuse Hous. Auth.,*
    962 F.2d 1101 (2d Cir. 1992)..................................................................................................8

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002)...............................................................................................................11

*U.S. v. Toy Nat'l Bank,*
    1979 WL 1341 (N.D. Iowa Feb. 27, 1979)..............................................................................7

*United Hosp. Serv., Inc. v. U.S.,*
    384 F. Supp. 776 (S.D. Ind. 1974)...........................................................................................7

*Warth v. Seldin,*
    422 U.S. 490 (1975)..................................................................................................................8

*Weiszmann v. Kirkland & Ellis,*
    732 F. Supp. 1540 (D. Colo. 1990).......................................................................................25

*Yucyo Ltd. v. Republic of Slovenia,*
    984 F. Supp. 209 (S.D.N.Y. 1997) .......................................................................................25

## Statutes

26 C.F.R. § 1.501...................................................................................................................6

Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692............................................ *passim*

Fed. R. Civ. P. 8(a) ...........................................................................................................11, 13,

Hill-Burton Act, 42 U.S.C. § 291(c) ............................................................................ *passim*

Internal Revenue Code, 26 U.S.C. § 501(c)(3) .................................................................. 2

New York General Business Law § 349 .................................................................... 3, 21, 22

New York Real Property Law § 420 .............................................................................. 23

Restatement (Second) Trusts § 391, comment C ............................................................ 23

**Other Authorities**

20 N.Y.Jur.2d *Conspiracy -- Civil Aspects* § 10, at 12 (1982)) .......................................... 15

H.Rep. No. 1860, 75th Cong. 3d Sess. 19 (1939) ............................................................ 4

FSA-RUL, UIL No. 501.03-11;
 CCH IRS Letter Rulings Report No. 1254, 03-14-01 (Feb. 5, 2001) ...................... 5, 7, 10, 12

I.R.S. Rev. Rul. 69-545 ............................................................................................. 5

S. Rep. No. 95-382, reprinted in 1977 U.S.C.C.A.N. 1695 ................................................ 14

## PRELIMINARY STATEMENT

Legions of uninsured working poor in the United States today live in fear of accident, sickness and disease. They are exposed to financial ruin when they obtain fundamental, and sometimes lifesaving, medical care. Since they are uninsured, the working poor are greatly exposed to the risk of bankruptcy in the event of an extended hospital stay or enduring medical condition. In the absence of uniform national health coverage, federal, state and local governments have endeavored to foster the provision of affordable medical services for the indigent by turning to private hospitals and offering them generous tax exemptions. These valuable concessions were not borne out of the governments' good nature, but rather, in exchange for a *quid pro quo*: the hospitals' obligation to provide medical care to uninsured and indigent patients regardless of their ability to pay.

Sandra Carlson and Marjorie Cummings lack medical insurance. Ms. Carlson's daughter, Stephanie, a minor, received treatment at North Shore University Hospital in Manhasset, and Marjorie Cummings was a patient at Long Island Jewish Medical Center. These hospitals belong to the North Shore-Long Island Jewish Health System, which comprises 17 member hospitals, four long-term-care facilities, four home care agencies and a hospice care network throughout New York City and New York State, and considers itself the nation's "third largest, non-profit, secular healthcare system."[1]

Defendants not only charged Plaintiffs discriminatory and exceedingly inflated rates for medical services, but also subjected them to aggressive, abusive and humiliating collection

---

[1] Sandra Carlson and Marjorie Cummings are collectively referred to herein as "Plaintiffs." North Shore University Hospital in Manhasset and Long Island Jewish Medical Center are collectively referred to herein as "Hospitals." North Shore-Long Island Jewish Health System, Inc. is referred to herein as "System." Hospitals and System are collectively referred to herein as "Defendants." References to the memoranda of law submitted by Hospitals and System are referred to hereinafter as "Hosp. Br." and "System Br." respectively. References to Plaintiffs' Complaint are referred to hereinafter as "¶ __."

practices when they lacked the means to pay.  Thus, Plaintiffs have turned to this Court, on behalf of themselves and all other similarly situated uninsured patients of Defendants, to seek redress for the damages they suffered at the hands of the so-called "not-for-profit" hospitals and health care system that have taken advantage of them.

Defendants' statement that this case is a "misguided attempt" to "establish national health care policy" attempts to steer this Court's attention away from this case's true legal underpinnings: violations of federal and state statutes and well-settled common law principles. In that regard, among other claims, Plaintiffs advance a third-party beneficiary claim that directly follows the precedents set forth in the Hill-Burton Act (42 U.S.C. § 291(c)) ("Hill-Burton") cases.  Hill-Burton provides federal grants to state agencies to assist in creating statewide systems of hospital care to reach all the people of a state.  In these cases, courts recognize that a hospital receiving federal funds and making assurances to the government that it will treat the indigent has contractual obligations that may be enforced by indigent patients as third-party beneficiaries.  Similarly, in this case, Defendants' grant of tax-exempt status pursuant to Section 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)) - requiring non-profit hospitals to assure the government that they will provide *significant* medical services to charity (*i.e.*, "poor and distressed or ... underprivileged") patients to maintain their tax exemption - creates a contract and obligations for the benefit of the indigent.  Accordingly, when indigent patients are charged inflated and discriminatory rates for medical services solely because they are uninsured, are required to guarantee payment of those charges before the charges are known, and face harsh and relentless collection tactics by the hospitals, those obligations are breached and a cause of action lies to enforce the nonprofit hospitals' obligations.

2

Plaintiffs also advance a claim for violations of the Fair Debt Collection Practices Act ("FDCPA") (15 U.S.C. § 1692 *et. seq.*). Defendants are "debt collectors" within the meaning of the statute and have conspired with, urged and aided several collection agencies that have employed aggressive, abusive and humiliating tactics in an effort to collect the exorbitant fees their indigent and uninsured patients have been charged.

Further, Plaintiffs advance state law claims for breach of contract and the implied covenant of good faith and fair dealing. When Plaintiffs arrived at the hospital, they were required to sign form contracts wherein they agreed to pay unspecified and undocumented charges in exchange for medical care. Despite Defendants' express and/or implied contractual obligation to charge indigents no more than a fair and reasonable charge for such medical care, Defendants breached this obligation by charging the highest and full, undiscounted costs for medical care which were unfair, unreasonable, and bore no relation to the actual cost of providing such services. Plaintiffs also advance claims for breach of charitable trust and violations of New York General Business Law Section 349 ("GBL § 349") that allege, *inter alia*, that Defendants engage in price gouging with respect to their indigent and uninsured patients. Additionally, in collecting unconscionable fees from these patients, Plaintiffs allege that Defendants have been unjustly enriched at their expense, giving rise to the establishment of a constructive trust in their favor.

Finally, Defendants' protestations to the contrary notwithstanding, Plaintiffs have standing to bring this lawsuit because Plaintiffs and the Class have all been injured by Defendants' wrongful conduct as they were charged exorbitant fees for medical services simply because they were uninsured. The wrongful conduct can be directly traced to the Defendants because the Defendants themselves create and determine the fees they charge their patients and

3

the injury can be easily remedied by requiring Defendants to charge fees equal to or less than they charge their privately insured, Medicare and Medicaid patients.

## ARGUMENT

## I. PLAINTIFFS' THIRD PARTY BENEFICIARY CLAIM IS WELL PLED

### A. The 501(c)(3) Tax Exemption Creates A Contract With the United States

The exemption from taxation of money or property devoted to charitable and other purposes is based upon the theory that the government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from public funds and by the benefits resulting from the promotion of the general welfare. H.Rep. No. 1860, 75th Cong., 3d Sess. 19 (1939); *see Bob Jones University v. U.S.*, 461 U.S. 574, 587-88 (1983) ("underlying all relevant parts of the [Internal Revenue] Code is the intent that entitlement to tax exemption depends on meeting certain common-law standards of charity.... [Congress] sought to provide tax benefits to charitable organizations, to supplement or take the place of public institutions of the same kind."). The "reason underlying the [tax] exemption granted" to charitable organizations "is that [the] exempted taxpayer performs a public service." *Duffy v. Birmingham*, 190 F.2d 738, 740 (8th Cir. 1951). *Duffy* explains:

> The common element of charitable purposes within the meaning of the ...[federal tax law] is the relief of the public of a burden which otherwise belongs to it. Charitable purposes are those which benefit the community by relieving it pro tanto from the obligation which it owes to the objects of the charity as members of the community.

*Id.* As demonstrated below, *Duffy* is consistent with the legislative history of federal income tax exemptions for charitable organizations.

Section 501(c)(3) provides that the federal government is prepared to relinquish its right to collect certain taxes from a charitable organization if it applies for recognition as a tax-exempt

organization and agrees to meet the criteria set out in the law and regulations (*i.e.,* "an organization must be both organized and operated exclusively for charitable purposes," 26 C.F.R. 1-501.(c)(3)-1(a)). Under Section 501(c)(3), "charitable" is defined as "[r]elief of the poor and distressed or of the underprivileged." *Id.* at (d)(2). A hospital's stated policies to provide health care services to the indigent are not sufficient to satisfy the charity care requirement of the community benefit standard under the operational test in Treas. Reg. § 1.501(c)(3)-1(c) unless the hospital demonstrates that such policies actually result in the delivery of *significant* health care services to the indigent. FSA-RUL, UIL No. 501.03-11; CCH IRS Letter Rulings Report No. 1254, 03-14-01 (Feb. 5, 2001) ("FSA") (emphasis added) (annexed hereto as Ex. A). *See* 26 CFR § 1.501(c)(3)(c)(1) (organization will not be so regarded if more than insubstantial part of activities not in furtherance of exempt purpose); 26 C.F.R. § 1.501(c)(3)(d)(2), *supra,* at 10 (defining "charitable"); *Fed'n Pharm. Serv., Inc. v. Comm'r,* 72 T.C. 687, 692 (1979), *aff'd,* 625 F.2d 804 (8th Cir. 1980) (organization whose purpose is to benefit health is not automatically entitled, without more, to desired exemption); I.R.S. Rev. Rul. 69-545 (care to indigent must be sufficient to be "of benefit to the community").

Against this backdrop, the terms of the contract in this case between the Defendants and the United States are straightforward. The contract is founded on the government's decision to forego tax revenue in return for Defendants' agreement to provide significant charitable health care services to the indigent. Defendants' application and agreement to meet the statutory and regulatory criteria is the offer to form a contract. The government accepted the offer by awarding Defendants tax-exempt status. The *sine qua non* of the exemption is the provision of free or low-cost health care to the indigent.

5

Moreover, by way of analogy, Hill-Burton "provides for federal grants of funds to a State and private parties to build or modernize a hospital facility on condition, *inter alia*, that the State be given assurances from the private parties that 'there will be made available in the facility ... a reasonable volume of services to persons unable to pay therefor....'" *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir. 1972) (quoting 42 U.S.C. § 291(e)) (emphasis in original).  In that regard, it has long been held that hospitals that apply for and accept Hill-Burton funds are contractually obligated to provide charity care to indigent and uninsured patients. *See, e.g., Corum v. Beth Israel Med. Ctr.*, 359 F. Supp. 909, 912-13 n.3 (S.D.N.Y. 1973) ("There is no dispute that, under Federal law and by contract, part of the quid pro quo for the [Hill-Burton] grant is the requirement that [the hospital] afford poor persons a reasonable amount of free or below cost services"; "As required by federal law, [the hospital's] application for Hill-Burton funds included an assurance that 'the facility . . . will furnish below cost or without charge a reasonable volume of services to persons unable to pay therefor' .... Such an assurance creates a contractual relationship intended to benefit persons like the plaintiffs and those whom they seek to represent, who are unable to pay for [the hospital's] services.") (internal citations omitted).

The general propositions for which Defendants cite cases in support of their argument that Section 501(c)(3) does not create a contract between Defendants and the government should not be taken at face value (*see* Hosp. Br. at 10-11).  Although Defendants argue that "[n]o court has ever held that the grant of a tax exemption pursuant to § 501(c)(3) ... amounts to an enforceable government contract" (Hosp. Br. at 10), this proposition has never been rejected.  In addition, Defendants also contend that they need not provide low-cost health care to indigent and uninsured patients and still may be deemed a charitable organization within the meaning of Section 501(c)(3) as the term "charitable" is defined "broadly, i.e., as the term is used in its

6

'generally accepted legal sense.'" (Hosp. Br. at 13-15). This argument is ignorant of and contrary to the Treasury Regulations' definitions of "charity." *See* 26 C.F.R. § 1-501(c)(3)-1(d)(2), *supra* (defining "charitable"). Indeed, "to qualify as a tax exempt charitable organization, a hospital must still provide services to indigents." *Geisinger Health Plan v. Comm'n. Internal Rev. Serv.*, 985 F. 2d 1210, 1217 (3rd Cir. 1993) (cited by Defendants with approval (Hosp. Br. at 15)).[2]  "A 'charitable' hospital may impose charges or fees for services rendered, ... but a serious question is raised where the charitable operation is virtually inconsequential." *Sonora Cmty. Hosp. v. Comm'r*, 46 T.Ct. 519, 526 (1966).

In any event, the determination as to "whether a hospital satisfies the community benefit standard is based on all the facts and circumstances" (*see* FSA). It is a fact-intensive question that is not appropriately resolved upon motion to dismiss. *Cf. U.S. v. Toy Nat'l Bank*, 1979 WL 1341, at * 5 (N.D. Iowa Feb. 27, 1979) (Section 501(c)(3) qualification question of fact into which IRS may investigate in conjunction with determination of tax liability); *Haswell v. U.S.*, 500 F.2d 1133, 1142 (Ct. Cl. 1974) (whether organization operated exclusively for charitable purposes under 501(c)(3) is question of fact); *United Hosp. Serv., Inc. v. U.S.*, 384 F. Supp. 776, 780 (S.D. Ind. 1974) (same). Thus, the existence of a contract is well-pled.

---

[2] Defendants' reliance upon three cases for the propositions that "the 'community benefit' standard ... is flexible" and that they are not obligated to provide "reduced-price care to indigent patients" (Hosp. Br. at 14-15) is misplaced. *Geisinger, supra*, and *IHC Health Plans Inc. v. Comm'r of Internal Revenue*, 325 F.3d 1188, 1197-98 (10th Cir. 2003), are factually inapposite as they involved HMOs - which, unlike hospitals, did not provide health care services directly - that were denied tax-exempt status under Section 501(c)(3). In *IHC*, the Tenth Circuit affirmed the denial, as the HMOs provided "virtually no free or below-cost health-care services." *Id.* at 1200. "[A]n organization which does not extend some of its benefits to individuals financially unable to make the required payments [generally] reflects a commercial activity rather than a charitable one." *Id.* (quoting *Fed'n Pharmacy Servs., Inc. v. C.I.R.*, 625 F.2d 804, 807 (8th Cir. 1980). In *St. David's Health Care Sys., Inc. v. U.S.*, 2002 U.S. Dist. LEXIS 10453 (W.D. Tex. Jun. 7, 2002), whether or not entity had "charitable purpose" was determined at *summary judgment*.

**B.**    **Plaintiffs Have Standing To Sue**

In order to meet Article III's constitutional requirements for standing, a plaintiff must allege (1) an actual or threatened injury to himself, (2) that is fairly traceable to the allegedly unlawful conduct of the defendant, and (3) is likely to be redressed by the requested relief. *See Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 373 (2d Cir. 2004); *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1106 (2d Cir. 1992).

For purposes of standing, Plaintiffs' "actual or threatened injury" must be "distinct and palpable." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). In other words, Plaintiffs must have "a direct and personal stake in the controversy." *Sullivan*, 962 F.2d at 1107 (citations omitted). Plaintiffs allege that because they lack medical insurance, they were charged inflated discriminatory rates for medical services as compared to rates charged to Medicare and Medicaid recipients and persons covered by private third-party insurance. Indeed, but for their lack of insurance, Plaintiffs would have been charged substantially less for the services they received.

Moreover, their injuries are fairly traceable to Defendants' conduct as Defendants create and determine the exorbitant fees they charge their uninsured patients and also initiate the abusive and aggressive collection efforts which their poor uninsured patients are subjected to when they cannot pay, both of which are direct sources of Plaintiffs' injury. Finally, the Court can readily redress this injury by awarding appropriate relief (e.g., reduction of the amounts billed to the amounts charged that would have been to insured or Medicaid or Medicare patients on provision of charity care) and/or injunctive relief. The former would remedy the overcharges already made; the latter would assure their poor uninsured patients that they would not be required to pay these premium rates for medical services in the future.

8

Defendants argue that Plaintiffs lack standing "to enforce rights allegedly arising from the grant of a tax exemption to another party" (Hosp. Br. at 13). This argument is supported merely by citations to four factually inapposite cases.[3]  Moreover, this argument not only ignores the fact that Plaintiffs were the intended beneficiaries of Section 501(c)(3) (*see Clinton v. City of N.Y.*, 524 U.S. 417, 434 (1998) (that more than one party may have standing to challenge particular action or inaction is "self-evident")), it also overlooks Plaintiffs' standing to assert their state law claims, which are independent of Defendants' tax-exempt status.

As discussed, Hill-Burton provides federal grants to state agencies to assist in creating statewide systems of hospital care to reach all the people of a state. *See Mulvihill v. Julia L. Butterfield Mem'l Hosp.*, 329 F. Supp. 1020, 1022-23 (S.D.N.Y. 1971) (citation omitted).  Since Hill-Burton's enactment, courts have conferred standing on poor patients to sue either as third party beneficiaries or upon a ruling that an implied civil remedy exists under the statute. *See, e.g., Flagstaff Med. Ctr. v. Sullivan*, 962 F.2d 879 (9th Cir. 1992) (patients eligible for uncompensated care under Hill-Burton had standing to sue hospital for failure to provide such care as third party beneficiaries); *Saine v. Hosp. Auth. of Hall County*, 502 F.2d 1033 (5th Cir.

---

[3] Defendants' reliance upon *Allen v. Wright*, 468 U.S. 737 (1984) and *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976), is misplaced, because each case involved a speculative chain of causation between the tax-exempt status of the organization whose conduct was being challenged and the alleged injuries of the plaintiffs.  In *Allen*, the court denied the parents of black children attending public schools standing to bring a claim that *the IRS* -- by granting tax-exempt status to racially discriminatory schools -- diminished their children's opportunity to receive an education in racially integrated schools. In other words, the illegal conduct challenged was "[the IRS's] grant of tax exemptions to some racially discriminatory schools." *Id.* at 745.   The Court held that the alleged injury "result[ed] from the independent action of *some third party not before the court.*" *Id.* (quoting *Simon*, 426 U.S. at 42) (emphasis added).  Similarly, in *Simon*, the plaintiffs alleged that the IRS violated the Internal Revenue Code and the Administrative Procedure Act by issuing a revenue ruling allowing favorable tax treatment to nonprofit hospitals that only offered emergency-room services to indigents instead of full hospital services.   The Court held that the plaintiffs lacked standing to bring the suit because they failed to establish that the asserted injury was the consequence of the IRS' actions. *Fulani v. Bentsen*, 35 F.3d 49 (2d Cir. 1994), *In re United States Catholic Conference*, 885 F.2d 1929 (2d Cir. 1989) and *Selman v. Harvard Med. Sch.*, 494 F. Supp. 603 (S.D.N.Y.), *aff'd* 636 F.2d 1204 (2d Cir. 1980) are also distinguishable for the same reasons as *Simon*.

1974) (indigent class had standing to sue non-conforming hospital under Hill-Burton because there is implied authorization); *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir. 1972) (civil remedy may be implied for all those within protective realm of legislation or regulation in public interest and such right is not dependent on existence of formal contractual relationship); *John Muir Mem'l Hosp. v. Davis*, 559 F. Supp. 1042 (N.D. Cal. 1983) (hospital's acceptance of Hill-Burton funds creates legally enforceable free care obligation in indigent patients); *N.Y. City Coalition for Cmty. Health v. Lindsay*, 362 F. Supp. 434, 439 (S.D.N.Y. 1973) ("The Hill-Burton Act cases … held to be beneficiaries the ultimate consumers of hospital services who were indigent"); *Corum v. Beth Israel Med. Ctr.*, 359 F. Supp. 909 (S.D.N.Y. 1973) (*quid pro quo* of acceptance of Hill-Burton funds was obligation to provide uncompensated medical care to indigents); *Org. Migrants in Cmty. Action v. James Archer Smith Hosp.*, 325 F. Supp. 268, 271 (S.D. Fla. 1971); *Cook v. Ochsner Found. Hosp.*, 319 F. Supp. 603 (E.D. La. 1970), *aff'd*, 559 F.2d 968 (1977).

Hill-Burton and Section 501(c)(3) were enacted to provide government funds to non-profit hospitals that assure the provision of significant charity care to indigent and uninsured patients. Both the Hill-Burton cases and this case involve the same category of defendants (not-for-profit hospitals) and the same class of plaintiffs (indigent and uninsured patients). Moreover, while Hill-Burton requires recipient hospitals to provide a "reasonable volume of medical services to persons unable to pay," Section 501(c)(3) requires that hospitals operate "exclusively" for "charitable purposes" - which 26 C.F.R. § 1.501(c)(3)(d)(2) defines as "relief of the poor and distressed or of the underprivileged" - and provide "significant" charitable healthcare services to the indigent. *See* FSA. Accordingly, since standing to sue under Hill-Burton has long been conferred on indigent and uninsured patients, *a fortiori*, it should be conferred on Plaintiffs here. *See Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181 (10th Cir. 1975)

(class action by indigent patients claiming breach of duty by hospital to provide indigent care under Section 501(c)(3) allowed to proceed).

**C.  Plaintiffs Are Intended Third Party Beneficiaries Of The Contract Between Defendants And The United States**

Plaintiffs have more than adequately alleged a claim for breach of the contract between the government and the Defendants as third party beneficiaries.  Under Rule 8(a) of the Federal Rules of Civil Procedure - which applies to *all* of Plaintiffs' claims in this case - Plaintiffs "must simply provide '(1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks.'" *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 322 (S.D.N.Y. 2003) (quoting Fed. R. Civ. P. 8(a)).[4]  "A complaint that complies with the federal rules of civil procedure cannot be dismissed on the ground that it is conclusory or fails to allege facts." *Id.* at 323-24 (quoting *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002)).  "[P]laintiffs need not provide anything more than sufficient notice to permit defendant to file an answer." *Id.* at 324.

The proper test for determining third-party beneficiary status under New York law is whether: (1) a valid and binding contract between other parties exists; (2) the contract was intended for the third party's benefit; and (3) the benefit to the third party is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty. *See McNeill v. N.Y. City Hous. Auth.*, 719 F. Supp. 233, 249, n.11 (S.D.N.Y. 1989).[5]  The

---

[4] "[Rule 8(a)'s] simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

[5] Although this case involves relationships and obligations created under federal statutes and regulations governing tax-exempt charitable organizations, where the Complaint raises no question regarding the liability of the United States or the responsibilities of the United States under an alleged contract, state

11

intended beneficiary need not be specifically or individually identified in the contract (*see Pilot Air Freight Corp. v. City of Buffalo*, 1991 U.S. Dist. LEXIS 18600, at *11 (W.D.N.Y. Dec. 16, 1991)), "but must fall within [a] class clearly intended to be benefited thereby." *Montana v. United States,* 124 F.3d 1269, 1273 (Fed.Cir.1997).

Here, the first and second prongs are met as a valid and binding contract between Defendants and the government clearly exists (see Section I-A, *supra*) and Section 501(c)(3)'s requirement that Defendants operate "exclusively" for charitable purposes was intended to benefit the specific beneficiaries of Defendants' charitable mission: uninsured and indigent patients with medical needs and limited means, like the Plaintiffs and the Class here.

The third prong is also satisfied here. The underlying purpose of the tax exemption is to assure that Defendants' activities will "actually result in the delivery of significant health care services to the indigent" (*see* FSA). Under Section 501(c)(3), Defendants were required to be "organized and operated exclusively for charitable purposes." As used under the IRS Regulations, the term charitable is construed to encompass "[r]elief of the poor and distressed or of the underprivileged." 26 C.F.R. § 1.501(c)(3)-1(d)(2). However, Defendants have promoted the health of *insured*, Medicaid and Medicare patients by giving these patients substantial discounts while charging *uninsured* patients inordinately inflated rates. The inflated medical rates Defendants charge constitute a *significant barrier* for uninsured patients to obtain needed medical services. Accordingly, uninsured and indigent patients are the intended third party beneficiaries of Defendants' agreement with the federal government under Section 501(c)(3) to operate exclusively for charitable purposes. This conclusion is in accord with the Hill-Burton

---

law applies to a third party beneficiary claim. *See Brian A. v. Sundquist,* 2000 U.S. Dist. LEXIS 21070, at *26 (M.D. Tenn. Oct. 24, 2000) (citing *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 28 (1977)).

cases (*see, e.g., Flagstaff, Saine, Euresti, Davis, Lindsay, Corum, Org. Migrants* and *Cook*, cited

and explained, *supra*, at pp. 9-10), which Defendants neither cite nor attempt to distinguish.[6]

Moreover, Defendants' argument that the Plaintiffs cannot enforce the contract as third

party beneficiaries (Hosp. Br. at 11) is patently flawed as it rests solely upon citations to general

propositions and one factually inapposite case. In addition, Defendants argue that, in essence,

Plaintiffs seek to assert a private right of action under Section 501(c)(3) (Hosp. Br. at 7-10).

Plaintiffs have not asserted this claim here and their argument is, therefore, irrelevant. Plaintiffs

nevertheless believe they would succeed on this claim.[7] In any event, Plaintiffs may allege the

violation of a federal statute as an element of a state law cause of action *regardless* of whether or

not an implied right of action under that statute exists.[8] Thus, Plaintiffs' allegations are

adequately pled under Rule 8.[9]

---

[6] *Growchowski v. Phoenix Constr.*, 318 F.3d 80, 85-86 (2d Cir. 2003), *Glass v. U.S.*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *Klamath Water Users Protection Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999), *State of Montana v. U.S.*, 124 F.3d 1269 n. 6 (Fed. Cir. 1997), *Oppedahl & Larson v. Network Solutions*, 3 F. Supp. 2d 1147, 1158 (D. Colo. 1998) and *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229 (D.C. Cir. 1991) were all decided at the post-discovery *summary judgment* stage and thus, Defendants' reliance thereon is misplaced.

[7] Under the test adopted by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78 (1975), an implied right of action exists because: (1) Plaintiffs belong to class for whose special benefit Section 501(c)(3) was enacted (indigent patients with medical needs and limited means); (2) strong indication of legislative intent to create such remedy; (3) implication of private remedy would further Section 501(c)(3)'s overriding purpose – providing health care services to indigent without regard to ability to pay; and (4) since Complaint raises substantial questions of Defendants' obligations pursuant to the IRC and involves federal contract, remedy is not one traditionally relegated to state law.

[8] *See, e.g., Brogdon v. National Healthcare Corp.*, 103 F. Supp. 2d 1322, 1335 (N.D. Ga. 2000) ("the absence of an implied private cause of action under the Medicaid Act does not preclude Plaintiffs from suing for breach of contract--it means only that Plaintiffs' claim does not 'arise under' the federal statute") (citing *City of Huntsville v. City of Madison*, 24 F.3d 169, 172-73 (11th Cir. 1994) (despite absence of private remedy for violation of federal statute, interpretation of federal statute was nevertheless necessary element of state breach of contract claim)); *Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 860 (S.D.N.Y. 1995) (complaint read not as asserting private right of action under NASD rules, but as asserting breach of contract claim); *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F. Supp. 1233, 1236 (S.D.N.Y. 1979) (brokers' violations of NYSE rules, while not giving rise to implied right of action, could be remedied by state common law actions for breach of contract).

[9] The same principle applies under the New York statute. Despite Defendants' contention that the tax exemption under Section 420-a of the New York Real Property Tax Law ("RPTL") does not require hospitals "to discount prices for uninsured patients" or to provide "free service to the poor" (Hosp. Br. at

## II.   PLAINTIFFS STATE A CLAIM UNDER THE FEDERAL FAIR DEBT COLLECTIONS PRACTICES ACT

Congress passed the FDCPA (15 U.S.C. § 1692 *et seq.*) to protect consumers from unfair and deceptive practices in the debt collection industry.[10]  The FDCPA's focus is on the conduct and methods of "debt collectors" - like Defendants here - when collecting debts owed to others.

When creditors attempt to collect their own debts directly (¶¶ 51,56), "a creditor becomes subject to the FDCPA if the creditor 'in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.'" *Maguire v. CitiCorp Retail Serv., Inc.*, 147 F.3d 232, 235 (2d Cir. 1998) (citing 15 U.S.C. § 1692(a)(6)).  Further, "[a] creditor uses a name other than its own when it uses a name that implies that a third party is involved in collecting its debts, 'pretends to be someone else' or 'uses a pseudonym or alias.'" *Id.* (citation omitted).  "Although a creditor need not use its full business name or its name of incorporation to avoid FDCPA coverage, it should use the 'name under which it usually transacts business, or a commonly-used acronym,' … or any name that it has used from the inception of the credit relation." *Id.* (citation omitted).  "Similarly, a creditor's in-house collection division … is not considered a debt collector 'so long as [it uses] the creditor's true business name when collecting.'" *Id.* (citation omitted) (alterations in original).

Regional Claims Recovery Service ("RCRS") is an unincorporated subdivision of System that acts as Defendants' agent in collecting outstanding bills from uninsured patients (¶ 10).  Clearly, since RCRS does not use the creditor's true business name when collecting, the name

---

16-17), at the very least, Section 420-a hospitals cannot operate for "pecuniary profit" – i.e., they cannot charge their uninsured patients, like the Plaintiffs here, "grossly inflated rates as compared to the actual cost of providing such services" (¶ 32) which, here, amounted to a profit ( ¶ 8).  Thus, Defendants have breached their contract with New York State and, for the reasons set forth above, Plaintiffs, as intended third party beneficiaries, have standing to sue.

[10] *See* S. Rep. No. 95-382 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1696 (FDCPA enacted "to protect consumers from a host of unfair, harassing, and deceptive debt collection practices ….").

under which it usually transacts business or a commonly-used acronym, contrary to Defendants' contention, they are in fact a "debt collector" within the meaning of the FDCPA.[11]

## III.   PLAINTIFFS' STATE LAW CONTRACT CLAIMS ARE WELL PLED

### A.   Plaintiffs' Breach of Contract Claim Is Well Pled

Plaintiffs have more than adequately alleged a claim for breach of contract under Rule 8(a). The Complaint alleges that Plaintiffs entered into form contracts with Defendants and sets forth the dates on which the contracts were entered (¶¶ 47,53,76) and the fact that those contracts were written (¶¶ 53,76). The Complaint also alleges that Plaintiffs agreed to pay unspecified and undocumented charges in exchange for medical care (¶ 53) and that, "by accepting and admitting Plaintiffs and the Class into their hospital for medical care, the North Shore Defendants undertook an express and/or implied contractual obligation to charge Plaintiffs and the Class no more than a fair and reasonable charge for such medical care" (¶ 77). Thus, Plaintiffs have alleged that Defendants "breached their contractual obligations under these form contracts by charging Plaintiffs and the Class the highest and full, undiscounted cost for medical care" (¶ 78). Plaintiffs have also alleged that "[t]hese charges are unfair, unreasonable, and bear no relation to

---

[11] In addition, Plaintiffs have alleged that Defendants conspired with debt collectors to violate the FDCPA. In their argument, Defendants ignore basic principles of conspiracy law as well as Plaintiffs' well-pled allegations. As is well established, "a conspirator, having joined the conspiracy and taken steps to assure its success, may be held responsible for the acts of his coconspirators in furtherance of their scheme." *Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1187-88 (S.D.N.Y. 1990) (citation omitted). "Indeed, all conspirators are liable, jointly and severally, as tortfeasors." *Id.* at 1188 (citing 20 N.Y.Jur.2d *Conspiracy -- Civil Aspects* § 10, at 12 (1982)). Defendants do not deny that they "sued [Plaintiff Carlson] to recover an outstanding bill" (citing ¶ 51) and that they "obtained a judgment against [Plaintiff Cummings] and placed a lien on her home, and, cryptically, that she 'suffered through three collection attorneys' hired by [Defendants]" (citing ¶ 57), yet they nevertheless attempt to distance themselves from the collections and harassment behavior they orchestrate, condone, assist and from which they benefit. Defendants' position finds no support under the law. By engaging in their conspiracy with debt collectors to create and collect inflated and deceptive overcharges from indigent and uninsured patients, Defendants and their "debt collectors" have acted as co-conspirators and are as fully and mutually liable as if they were a single, complicit entity.

the actual cost of providing such services" and that such breaches caused Plaintiffs and the Class damages (*Id.* at ¶¶ 58,78-79).[12]

Defendants, in turn, argue that Plaintiffs' contract claim should be dismissed because Plaintiffs do not attach the contract or plead its terms (Hosp. Br. at 20). Under New York law, however, to establish a claim for breach of contract, a plaintiff must "plead and prove [only] the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach." *RIJ Pharm. Corp. v. Ivax Pharms., Inc.*, 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004) (citations omitted). Additionally, "[it] is not required ... [that plaintiff] attach a copy of the contract" to the complaint. *Mayes v. Local 106, Int'l Union of Operating Eng'rs*, 739 F. Supp. 744, 748 (N.D.N.Y. 1990) (citation omitted). Here, however, that is especially true because Defendants are in possession of the contracts that Plaintiffs signed.[13]

Indeed, the cases Defendants cite that involve the issue of what constitutes the "reasonable value of services [received]" by patients of not-for-profit hospitals were all decided

---

[12] Contrary to Defendants' contention (Hosp. Br. at 20,22), not only do Plaintiffs plead damages as required under Rule 8, but the case primarily relied upon by the Defendants, *Designers North Carpet, Inc. v. Mohawk Indus., Inc.*, 153 F. Supp. 2d 193, 197 (E.D.N.Y. 2001), supports Plaintiffs here. In *Designers North*, even where the court found that "the breach of contract claim as pleaded in the complaint [was] vague and conclusory and, at best, inartfully drafted ..., the plaintiff [did] not describe the contract or contracts other than to say agreements existed between it and [the defendant] ... [and] [t]he plaintiff [did] not allege whether these agreements are written or oral, when they were made, the length of time they covered ... or any other terms[,]" "reading the complaint liberally and drawing all inferences in favor of the plaintiff" the Court found that "at [the motion to dismiss] stage, the complaint provides the short and plain statement that [Rule 8] requires to provide notice of the ground upon which relief is sought." *Id.*

[13] Defendants also argue that "the complaint contains only minimal allegations" and that "in their 34-page pleading, the plaintiffs set forth the entirety of the allegations pertaining to them in less than two pages" (Hosp. Br. at 5 (citing ¶¶ 47-57)). Again, Defendants ignore the standards set forth in Rule 8. "All that need be specified [in the Complaint] is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer. All that's required to state a claim in a complaint filed in a federal court is a short statement, in plain (that is, ordinary, nonlegalistic) English, of the legal claim. . . . The courts keep reminding plaintiffs that they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories." *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002) (internal citations omitted). Accordingly, the Complaint satisfies Rule 8 as it "fully sets forth who is being sued, for what relief, and on what theory, with enough detail to guide discovery. It can be read in seconds and answered in minutes." *McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996).

at the post-discovery, summary judgment stage. *See Flushing Hosp. & Med. Ctr. V. Woytisek,* 41 N.Y.2d 1081 (1977) ("in [the] record there [was] no tender of admissible evidentiary proof sufficient to require a trial"); *Huntington Hosp. v. Abrandt,* 4 Misc. 3d 1, 2, 779 N.Y.S.2d 891, 892 (2d Dep't 2004) (patient failed to provide *evidentiary proof* to raise a triable issue of fact); *Albany Med. Ctr. Hosp. v. Huberty,* 76 A.D.2d 949, 428 N.Y.S.2d 746 (3d Dep't 1980) (summary judgment granted based on *evidentiary* facts).[14]

Moreover, Defendants' wrongful conduct in this case also constitutes a breach of the implied covenant of good faith and fair dealing, which lies in every contract, including the contract in this case. *See AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.,* 305 A.D.2d 340, 342, 759 N.Y.S.2d 149, 151 (2d Dep't 2003) (citation omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* (citation omitted). The covenant applies when the parties are "bound in a fiduciary relationship."[15] *Id.* (citing cases). "To the extent that the express words of the contracts failed to prohibit some acts arguably inconsistent with the nature

---

[14] In that regard, Defendants state that "[i]f this case were to proceed to an evidentiary phase, [they] would be pleased to demonstrate the myriad ways in which they meet the 'community benefit' standard applied by the Internal Revenue Service in determining tax-exempt status ...." (Hosp. Br. at 2). Plaintiffs welcome the opportunity to conduct discovery as well and respectfully request that the Court allow the parties to proceed accordingly.

[15] A fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another. *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.,* 893 F. Supp. 285, 289 (S.D.N.Y. 1995). Indeed:

> In the common knowledge of man, patients submit themselves to the skills and arts, proficiency and expertise, of *hospital personnel, once they become confined to a hospital.* Indeed, most frequently they have no real choice in the matter; they are physically and intellectually unable to do much more than submit and rely upon the medical superiority and ethical propriety of their attendants. We have no difficulty in declaring a confidential relationship in the standing of a hospital to its patients.

17

of the relationship, the [Plaintiffs] could ... invoke the implied covenant of good faith and fair dealing." *Carvel Corp. v. Noonan*, 2004 N.Y. LEXIS 2415, at \*14 (Oct. 14, 2004).

Plaintiffs allege a duty owed to them by Defendants. Plaintiffs and the members of the Class, when arriving at Defendants' hospital in desperate need of emergency medical care (and clearly not dealing with each other at arm's length), placed a considerable amount of trust and confidence in the integrity of Defendants, who thereby gained a resulting superiority of influence over Plaintiffs (¶ 30). Defendants also assumed control and responsibility over Plaintiffs after insisting that they sign the necessary paperwork upon admission to the hospital, wherein they agreed to pay unspecified and undocumented charges in exchange for medical care. (*Id.* at ¶ 53). Such trust was breached when Defendants charged the uninsured multiple times what insured patients or the government would be charged. The situation was exacerbated when Defendants and their collection agencies vigorously pursued and harassed Plaintiffs in efforts to collect (¶¶ 35,51,56-7,82). Thus, Rule 8 is satisfied here.[16]

---

*Garcia v. Presbyterian Hosp. Ctr.*, 92 N.M. 652, 655, 593 P.2d 487, 490 (N.M. Ct. App. 1979) (emphasis added). *Cf. Reuben H. Donnelley Corp.*, 893 F. Supp. at 289 ("doctor/patient relationships are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties") (citation omitted).

[16] Defendants' argument that Plaintiff Cummings' claims must be dismissed under *res judicata* (Hosp. Br. at 5, fn. 4) is without merit. Although *res judicata* is usually pled in an answer, a Rule 12(b)(6) dismissal on the basis of *res judicata* is appropriate only "when it is clear, from the complaint and from matters of which the court takes judicial notice, that plaintiff's claims are barred as a matter of law." *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 220 (S.D.N.Y. 2002) (citing cases). Thus, "[i]n order to assess the res judicata ... argument[], the Court must review the filings in the [collection action], as well as the ... decision. Because those matters are outside the pleadings, they may not be considered on a motion to dismiss." *Sierra Rutile Ltd. v. Katz*, 1992 U.S. Dist. LEXIS 13518, at \*28 (S.D.N.Y. Sept. 9, 1992). Accordingly, since "*res judicata* is not apparent from [P]laintiff's complaint" (*Kurowski v. Bridgeport*, 1988 U.S. Dist. LEXIS 2239, at \*3 (D. Conn. Feb. 19, 1988)), "there are disputes as to the scope of the claims, settlements and orders issued" in the collection action (*Houbigant*, 229 F. Supp. 2d at 220), and since Plaintiffs have not received notice that the instant motion could be converted to a motion for summary judgment (*see Davis v. Bryan*, 810 F.2d 42, 45 (2d Cir. 1987)), Defendants' motion to dismiss on *res judicata* grounds should be denied. Moreover, Defendants' voluntary payment doctrine defense is equally unavailing. *Dillon v. V-A Columbia Cablevision of Westchester, Inc.*, 292 A.D.2d 25, 740 N.Y.S.2d 396 (2d Dep't 2002) – the lone case Defendants rely upon for this proposition – demonstrates the doctrine's inapplicability here. In *Dillon*, Plaintiff, a customer of defendant challenged a five-dollar late fee she paid for late payments. The complaint alleged that, although defendant

18

**B.**   **Plaintiffs' Unjust Enrichment/Constructive Trust Claim Is Well Pled**

The Complaint adequately alleges that Defendants were unjustly enriched since: (1) Defendants have "realized profits in the millions of dollars by charging Plaintiffs and the Class unreasonably high amounts for medical care" (¶ 99); (2) "Plaintiffs and the Class have suffered severe economic injury and other damages as a proximate consequence of [Defendants'] unjust enrichment" (¶ 100); and (3) "in good conscience and equity, [Defendants] should not be entitled to retain" the "tax savings, profits and other assets" reaped at Plaintiffs' expense (¶ 101). Indeed, to plead unjust enrichment, Plaintiffs must merely allege: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Maalouf*, 2003 U.S. Dist. LEXIS 5913 at *21 n.8 (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001)). Thus, Plaintiffs have met their "minimal burden." *Id.*

Defendants argue that Plaintiffs' unjust enrichment claim must fail because "[u]nder New York law, 'the existence of an express contract ... governing the particular subject matter of its claim for unjust enrichment precludes the plaintiff from maintaining a cause of action sounding in quasi-contract against [defendants]'" (Hosp. Br. at 21). Despite Defendants'

---

characterized the late fee as an administrative fee intended to be a reasonable estimate of its costs resulting from customers' late payments and nonpayments, it was an unlawful penalty bearing no relation to defendant's actual costs incurred in servicing such payments and plaintiff would not have paid the fee had she known the true facts. *See id.* The voluntary payment doctrine - which "bars recovery of payments made *with full knowledge of the facts*" (*Dillon*, 292 A.D.2d at 26, 740 N.Y.S.2d 396, 397 (emphasis added)) - barred plaintiff's complaint where plaintiff knew she would be charged a five dollar late fee if she did not make timely payment. *Here*, however, Plaintiff Cummings *totally lacked knowledge of the facts* that, not only would she be charged discriminatory and exceedingly inflated rates for medical services, but that she would be subject to abusive collection practices. Thus, the doctrine does not apply. At the very least, "Defendant[s] may not rely upon the voluntary payment doctrine to preclude Plaintiffs' proposed FDCPA claims." *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880, 895 (S.D. Ohio 2003).

stipulation to the existence of an express contract here, "[t]he fact that [Plaintiffs] may only *recover* on one claim, either contract or quasi-contract, certainly does not preclude [them] from *pleading* unjust enrichment in the alternative." *Maalouf v. Salomon Smith Barney, Inc.*, 2003 U.S. Dist. LEXIS 5913, at ** 20-21 (S.D.N.Y. Apr. 9, 2003) (citations omitted).

Moreover, "[a] constructive trust has long been a vehicle used by courts to do equity and prevent unjust enrichment." *Counihan v. Allstate Ins. Co.*, 907 F. Supp. 54, 56 (E.D.N.Y. 1995) (Wexler, J.) (citation omitted). "'[A] constructive trust is the formula through which the conscience of equity finds expression.'" *Id.* "Although, under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four factors,[17] the 'constructive trust doctrine is not rigidly limited ... [and a] constructive trust will be erected whenever necessary to satisfy the demands of justice.'" *Id.* (citation omitted); *accord Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 743 F. Supp. 176, 180 (S.D.N.Y. 1990) (elements are not talismanic and courts impose constructive trust in absence of some of these elements).

As discussed in Section III-A, *supra*, Plaintiffs have established a fiduciary relationship with Defendants.[18] As to the "promise" factor, Plaintiffs alleged that Defendants promised Plaintiffs, who are indigent and uninsured, that they would charge them "no more than a fair and reasonable charge for such medical care" (¶ 76). Although, beyond agreeing to pay within the foregoing limits, Plaintiffs may not have necessarily made "a transfer in reliance thereon," "this deficiency should not be allowed to spawn an inequitable result" (*Counihan*, 194 F.3d at 362), where, as here, Defendants broke their promises by charging Plaintiffs and the Class unreasonably high amounts for medical care" (¶ 99). Thus, a

---

[17] These elements are: (1) a confidential or fiduciary relation; (2) a promise; (3) a transfer in reliance thereon; and (4) unjust enrichment. *See Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999).
[18] Nevertheless, "the lack of a fiduciary relationship does not defeat the imposition of a constructive trust." *Id.*, 194 F.3d at 362 (citation omitted).

constructive trust should be imposed because Defendants "should not, in good conscience and equity, retain the benefits derived from such" wrongful conduct. *Counihan*, 194 F.3d at 362.[19]

## IV.   PLAINTIFFS' GBL § 349 CLAIM IS WELL PLED

Plaintiffs have stated a viable cause of action for violations of GBL § 349. As set forth in the Complaint, Defendants require all of their patients to sign form contracts prior to their receiving any treatment at Defendants' hospitals. These form contracts provide that when a patient is not covered by health insurance, Medicare or Medicaid, the patient agrees to pay a reasonable and customary rate for the particular treatment administered by the hospital (¶ 76). The violation of GBL § 349 occurs when Defendants engage in price gouging with respect to their uninsured patients such as Plaintiffs and the Class (¶ 95). Defendants exacerbate their unconscionable and deceptive conduct by utilizing their own collection agency, RCRS, and conspiring with and aiding other collection agencies in their aggressive and harassing tactics in attempting to collect their exorbitant bills (¶ 96).

GBL § 349 makes unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state ...." N.Y. Gen. Bus. L. § 349. The elements of this claim are: (1) a consumer-oriented materially misleading practice; and (2) injury to plaintiff as a result thereof. *See Steinmetz v. Toyota Motor Credit Corp.*, 963 F. Supp. 1294, 1306 (S.D.N.Y. 1997). Indeed, Rule 8 applies here as "claims under [Section 349] need not meet the heightened pleading standard applicable to common-law fraud claims." *Linens of Europe, Inc. v. Best Mfg.*, 2004 U.S. Dist. LEXIS 18575, at *61 (S.D.N.Y. Sept. 15, 2004).

New York courts routinely uphold GBL § 349 claims that arise from allegations of illegal, improper and/or excessive fees or charges. *See, e.g., Sterling v. Ackerman*, 244 A.D.2d

---

[19] In addition, it can be argued that Defendants promised the government they would provide significant medical services for uninsured patients, in reliance upon which the government conferred tax-exempt

170, 663 N.Y.S.2d 842, 843 (1st Dep't 1997) (allegations that defendant repeatedly violated limiting charge laws designed to protect elderly and disabled Medicare Part B beneficiaries clearly stated "impact on consumers at large" and stated cause of action under GBL § 349); *McKinnon v. Int'l Fidelity Ins. Co.*, 704 N.Y.S.2d 774, 778 (Sup. Ct., N.Y. Cty. 1999) (upholding GBL § 349 claim arising from false representations made by defendant as to amounts defendant was authorized to charge for bail premiums, which exceeded statutory maximum, and that defendant falsely represented expenses which had no relation to actual expenses); *See also Negrin v. Norwest Mortgage, Inc.*, 263 A.D.2d 39, 49-50 700 N.Y.S.2d 184 (2d Dep't 1999) (plaintiffs alleged violations of GBL § 349 arising from Norwest's practice of unilaterally charging improper and unwarranted recording fees and excessive fax fees); *Bauer v. Mellon Mortgage Co.*, 680 N.Y.S.2d 397, 400, 178 Misc. 2d 234 (Sup. Ct., N.Y. Cty. 1998) (practice of billing and collecting private mortgage insurance payments when such payments were not required violated GBL § 349 because it led plaintiffs to believe such payments were required).

Defendants argue that Plaintiffs' GBL § 349 claims must be dismissed because Plaintiffs: "fail to allege any deceptive act" that was "materially misleading"; "identify no statements that were false or deceptive or any other conduct which might have misled them"; and "do not allege that they understood from any source, much less from any statements by the Hospitals, that they would be charged 'discounted rates' for the medical care they requested" (Hosp. Br. 24). The crux of Plaintiffs' claim, however, is that Defendants' practice of price gouging their uninsured patients, compounded in many instances by their use and retention of collection agencies to pursue and collect those exorbitant outstanding hospital bills, constitutes unconscionable and deceptive conduct under GBL § 349. When patients sign Defendants' form contracts agreeing to pay reasonable and customary rates for treatment rendered, Defendants' subsequent act of price

---

status under 501(c)(3) and, as a result of their improper billing practices, they were unjustly enriched.

gouging their uninsured patients constitutes both deceptive and unconscionable conduct. Indeed, the prohibition against engaging in deceptive acts or practices is contained within GBL § 349 itself: "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

## V.    PLAINTIFFS' CHARITABLE TRUST CLAIM IS WELL PLED

By agreeing to operate for "charitable" purposes in exchange for substantial federal and state tax exemptions under Section 501(c)(3) and New York Real Property Law § 420-a, Defendants created an implied charitable trust to provide affordable health care for indigent and uninsured patients. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 29 (1976) ("the term 'charitable' in its legal sense and as it is used in section 501(c)(3) of the Code contemplates an implied public trust constituted for some public benefit....") (quoting IRS Revenue Ruling 56-185). Indeed, "New York courts have held that where a gift is made to a charitable corporation subject to the restriction that it be used for a specific purpose which is one of its corporate purposes … the cases have held that *a trust will be implied in the sense that the gift will be required to be devoted to the purposes for which it was given*." *Lefkowitz v. Cornell Univ.*, 35 A.D.2d 166, 171, 316 N.Y.S.2d 269 (4th Dep't 1970), *aff'd*, 28 N.Y.2d 876 (1971) (cited by Defendants at Hosp. Br., p. 22). Here, a charitable trust should be implied so that the "gift" of a generous tax exemption by the government is "devoted to the purposes for which it was given" – charitable health care for indigent and uninsured patients.

Contrary to Defendants' contentions, Plaintiffs, as beneficiaries of the charitable trust, have standing to enforce it. *See* Restatement (Second) Trusts § 391, comment c ("A charitable trust may … be created whereby a particular person is entitled to receive a benefit under the trust"). Clearly, since the tax exemption was granted to Defendants in exchange for their

commitment to provide charitable care to indigent and uninsured patients, like Plaintiffs, they indeed have standing to assert this claim.

## VI.   PLAINTIFFS' CLAIMS AGAINST SYSTEM ARE WELL PLED

Defendant System "is the parent organization to an integrated network of hospitals" (System Br. at 2, fn.1), including Defendant Hospitals. Like Defendant Hospitals, System is also alleged to have, *inter alia*, engaged in a pattern and practice of charging inordinately inflated rates for medical care to indigent and uninsured patients and employed aggressive, abusive and humiliating practices to recover outstanding bills (¶¶ 7,9).

In accordance with Rule 8(a), which System concedes applies here (System Br. at 2), Plaintiffs indicate the defendants against whom relief is sought (¶¶ 1-4), and specifically include "North Shore-Long Island Jewish Health System, Inc." (¶ 3) in defining the "North Shore Defendants" for the purpose of asserting common allegations and providing the basis for their claims against each of the "North Shore Defendants" respectively (¶ 5). For example, Plaintiffs claim, *inter alia*, that the "North Shore Defendants" (*i.e.*, Hospitals *and* System): (1) "promise the government ... that they do and will operate their hospitals on a non-profit basis and provide health care services to all New Yorkers regardless of their ability to pay"; (2) "engage[] in a pattern and practice of charging inordinately inflated rates for medical care to patients who are uninsured" and (3) "employ aggressive, abusive, and humiliating practices, including lawsuits, to recover this inflated medical debt from Plaintiffs and the Class" (¶¶ 5,7,9, *passim*).

Nevertheless, System argues that, since Plaintiffs collectively plead "undifferentiated" allegations against Hospitals and System as the "North Shore Defendants," the Complaint fails to plead "particular conduct" and is "utterly devoid of allegations concerning alleged wrongdoing" by System (System Br. at 2). This argument misapprehends the liberal pleading requirements of

24

Rule 8, which permits collectivized pleading against multiple defendants. *See Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.,* 2000 U.S. Dist. LEXIS 22130, \*24 (S.D.N.Y. Aug. 31, 2000) (reference to defendants as group sufficient to satisfy Rule 8(a)) (citing *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997) ("When multiple defendants are named in a complaint, the allegations can be and usually are read in such a way that each defendant is having the allegation made about him individually"); *Peters v. Amoco Oil Co.*, 57 F. Supp. 2d 1268, 1276 (M.D. Ala. 1999) (Under Rule 8(a), general use of term "defendants" sufficient); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Young,* 1994 U.S. Dist. LEXIS 2929 (S.D.N.Y. 1994) (Rule 8(a) does not require that individual defendant be advised of particularities of his involvement in alleged wrongful conduct)).[20] Thus, Plaintiffs' allegations satisfy Rule 8's pleading requirements.

## VII.   INJUNCTIVE AND DECLARATORY RELIEF ARE APPROPRIATE

Defendants argue that this claim "merely recites that plaintiff is seeking, in addition to the money damages ... declaratory and injunctive relief based on the claims purportedly stated in Counts One through Eight" (Hosp. Br. at 25). Because, for the reasons set forth above, Counts I – XIII are meritorious, Plaintiffs claims for injunctive and declaratory relief should be sustained.

## VIII.   PLAINTIFFS' CIVIL CONSPIRACY/CONCERT OF ACTION CLAIM

With respect to Count Eight, Plaintiffs refer the Court to the related *Plaintiffs' Opposition to Defendant American Hospital Association's Motion to Dismiss*, dated November 19, 2004.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the motions to dismiss be denied in their entirety.

---

[20] *None* of the cases cited by System - *Yucyo Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219 (S.D.N.Y. 1997), *Mathews v. Kilroe*, 170 F. Supp. 416, 417 (S.D.N.Y. 1959) and *Weiszmann v. Kirkland & Ellis*, 732 F. Supp. 1540, 1549 (D. Colo. 1990) (*see* System Br. at 2) - prohibit references to multiple defendants as a group and thus, Defendants' reliance upon these cases is misplaced.

Dated: New York, New York
      November 19, 2004

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

By:

Keith M. Fleischman (KF-0199)
Robert J. Berg (RB-8542)
Ronald J. Aranoff (RA-4690)
Brian S. Cohen (BC-2091)
10 East 40th Street, 22nd Floor
New York, New York 10016
Telephone:  (212) 779-1414
Facsimile: (212) 779-3218

**VROON & CRONGEYER, LLP**
Brian Vroon, Esq.
John Crongeyer, Esq.
1230 Peachtree Street, Suite 2450
Atlanta,GA 30309
Telephone:  (404) 607-6710
Facsimile:  (404) 607-6711

**BARRETT LAW OFFICE, P.A.**
Don Barrett, Esq.
404 Court Square North
P.O. Box 987
Lexington, MS 39095
(662) 834-2376
(662) 834-2628 (fax)

**Attorneys for Plaintiffs and the Class**

EXHIBIT A

Source: Legal > Secondary Legal > CCH > Taxation - Federal > IRS Releases > $ CCH Field Service Advice ⓘ
Terms: ("501(c)(3)")  (Edit Search)

✦Select for FOCUS™ or Delivery
☐

*Copyright 2004 CCH Incorporated, All Rights Reserved*

Copyright 2004 CCH Incorporated, All Rights Reserved
CCH Field Service Advice

Field Service Advice

Field Service Advice 200110030

February 5, 2001

Letter Date: February 5, 2001

CCH IRS Letter Rulings Report No. 1254

Report Date: March 14, 2001

IRS REF: Symbol: CC:TEGE:EOEG: EO2-FREV-106773-01

Uniform Issue List Information:

UIL No. 0501.03-11

Exemption from tax on corporations, certain trusts, etc. (Exempt v. not exempt)

-Religious, charitable, etc., institutions and commmunity chest

--Hospitals and health clinics

UIL No. 501.03-11 Exemption from tax on corporations, certain trusts, etc. (Exempt v. not exempt), Religious, charitable, etc., institutions and commmunity chest, Hospitals and health clinics

[ Code Sec. 501]

**TEXT:**
INTERNAL REVENUE SERVICE NATIONAL OFFICE FIELD SERVICE ADVICE

MEMORANDUM FOR JUDITH PICKEN, AREA COUNSEL (GREAT LAKES & GULF COAST AREA), CC:TEGE:GLGC

FROM: Assistant Chief Counsel (Exempt Organizations/Employment Tax/Government Entities), CC:TEGE:EOEG:EO2

SUBJECT: Exempt Hospitals' Compliance with Treas. Reg. §1.501(c)(3)-1(c).

This Field Service Advice responds to your request for interim guidance on the legal criteria for hospitals to qualify for exemption under section **501(c)(3)**. Field Service Advice is not binding on Examination or Appeals and is not a final case determination. This document is not to be used or cited as precedent.

DISCLOSURE STATEMENT

Field Service Advice is Chief Counsel Advice and is open to public inspection pursuant to the provisions of section 6110(i). The provisions of section 6110 require the Service to remove taxpayer identifying information and provide the taxpayer with notice of intention to disclose before it is made available for public inspection. §6110(c) and (i). Section 6110(i)(3)(B) also authorizes the Service to delete information from Field Service Advice that is protected from disclosure under 5 U.S.C. §552 (b) and (c) before the document is provided to the taxpayer with notice of intention to disclose. Only the National Office function issuing the Field Service Advice is authorized to make such deletions and to make the redacted document available for public inspection. Accordingly, the Examination, Appeals, or Counsel recipient of this document may not provide a copy of this unredacted document to any taxpayer or its representative. The recipient of this document may share this unredacted document only with those persons whose official tax administration duties with respect to the case and the issues discussed in the document require inspection or disclosure of the Field Service Advice.

You have requested preliminary advice and guidance on case development concerning the following issue.

ISSUE

Whether a hospital whose stated policies are to provide health care services to individuals regardless of their ability to pay satisfies the charity care requirement of the community benefit standard under the operational test in Treas. Reg. §1.501(c)(3)-1(c)?

CONCLUSION

A hospital's stated policies to provide health care services to the indigent are not sufficient to satisfy the charity care requirement of the community benefit standard under the operational test in Treas. Reg. §1.501(c)(3)-1(c), unless the hospital demonstrates that such policies actually result in the delivery of significant health care services to the indigent.

LAW AND ANALYSIS

Section 501(a) generally provides that organizations described in section **501(c)(3)** shall be exempt from federal income tax. Section **501(c)(3)** describes organizations organized and operated exclusively for charitable or other specified purposes. Treas. Reg. §1.501(c)(3)-1(a) (1) and Treas. Reg. §1.501(c)(3)-1(c), respectively, set forth an organizational test and an operational test to determine whether an organization qualifies for exemption under section **501(c)(3)**. An organization must meet both the organizational test and the operational test to qualify for exemption under section **501(c)(3)**. Levy Family Tribe v. Commissioner, 69 T.C. 615, 618 (1978) [CCH Dec. 34,937]; Treas. Reg. §1.501(c)(3)-1(a)(1).

A. Promotion of Health as a Charitable Purpose

Section **501(c)(3)** uses the term "charitable" in its generally accepted legal sense. Nationalist Movement v. Commissioner, 102 T.C. 558, 576 [CCH Dec. 49,769], aff'd, 37 F.3d 216 (5th Cir. 1994) [94-2 USTC P 50,581], cert. denied, 513 U.S. 1192 (1995); Treas. Reg. §1.501(c)(3)-1(d)(2). Accordingly, the courts have looked to the law of charitable trusts to ascertain what activities are charitable for purposes of section **501(c)(3)**. See, e.g., Redlands Surgical Services v. Commissioner, 113 T.C. 47, 73 (1999) [CCH Dec. 53,459], appeal docketed, No. 99-71253 (9th Cir., Sept. 17, 1999); Sound Health Association v. Commissioner, 71 T.C. 158, 178 (1978) [CCH Dec. 35,519]. Based on the law of trusts, the courts and the Service have ruled that the promotion of health is a charitable purpose under section **501(c)(3)**. See, e.g., Redlands Surgical Services, 113 T.C. at 73 [CCH Dec. 53,459];

Sound Health, 71 T.C. at 178 [CCH Dec. 35,519]; Rev. Rul. 69-545, 1969-2 C.B. 117. See also Restatement (Second) of Trusts §§368, 372 (1959); 4A Austin W. Scott & William F. Fratcher, The Law of Trusts §§368, 372 (4th ed. 1989).

B. Requirements of Community Benefit Standard

A hospital or other health care organization does not automatically qualify for exemption under section **501(c)(3)** merely because it promotes health. See Federation Pharmacy Services, Inc. v. Commissioner, 72 T.C. 687, 692 (1979) [CCH Dec. 36,198], aff'd, 625 F.2d 804 (8th Cir. 1980) [80-2 USTC P 9553] ("We do not believe that the law requires that any organization whose purpose is to benefit health, however remotely, is automatically entitled, without more, to the desired exemption"); Sonora Community Hospital v. Commissioner, 46 T.C. 519, 525-526 (1966) [CCH Dec. 28,053], aff'd, 397 F.2d 814 (9th Cir. 1968) [68-2 USTC P 9528] ("While the diagnosis and cure of disease are indeed purposes that may furnish the foundation for characterizing the activity as 'charitable,' something more is required.") Specifically, the courts and the Service require that a hospital or other health care organization must primarily benefit the community in order to qualify for exemption under section **501(c)(3)**. See, e.g., Redlands Surgical Services, 113 T.C. at 73 [CCH Dec. 53,459]; Geisinger Health Plan, 985 F. 2d at 1219 [93-1 USTC P 50,583]; Sound Health, 71 T.C. at 180-181 [CCH Dec. 35,519]; Rev. Rul. 69-545, 1969-2 C.B. 117. The determination by the courts and the Service about whether a hospital satisfies the community benefit standard is based on all the facts and circumstances. See, e.g., Redlands Surgical Services, 113 T.C. at 92 [CCH Dec. 53,459]; Rev. Rul. 69-545, 1969-2 C.B. 117.

C. Charity Care Establishes a Community Benefit

The provision of free or subsidized care to the indigent is a significant indicator to the courts and the Service that a hospital promotes health for the benefit of the community. In Rev. Rul. 69-545, 1969-2 C.B. 117, the Service ruled that a hospital which operated a full-time emergency room, did not deny emergency care to those who could not afford to pay and met certain other requirements qualified for exemption. These charitable indicia outweighed the fact that the hospital ordinarily limited admissions to individuals who could afford to pay for their hospitalization and referred indigent patients requiring hospitalization to another hospital in the community that served indigent patients. By contrast, Rev. Rul. 69-545 denied exemption to a hospital that maintained an emergency room on a "relatively inactive basis" primarily for the convenience of its paying patients and instructed ambulance services to take emergency cases to other area hospitals. In Rev. Rul. 83-157, 1983-2 C.B. 94, the Service stated that operating a full time emergency room open to all, regardless of a person's ability to pay, "is strong evidence that a hospital is operating to benefit the community." In Rev. Rul. 98-15, 1998-1 C.B. 718, a material factor for the Service's conclusion that a hospital, which entered into a joint venture with a for-profit entity, furthered charitable purposes was that the hospital would use its partnership distributions "to help provide health care to the indigent."

In Geisinger Health Plan, the court stated that "to qualify as a tax exempt charitable organization, a hospital must still provide services to indigents." 985 F.2d at 1217 [93-1 USTC P 50,583]. In Redlands Surgical Services, the court stated that one of the indicia of community benefit is "whether the organization provides free care to indigents." 113 T.C. at 73 [CCH Dec. 53,459]. In Sound Health, the court ruled that a health care organization operated for charitable purposes, in part because it offered free emergency room care to the indigent and directed the ambulance company that it would treat any emergency patient. 71 T.C. at 172, 184 [CCH Dec. 53,519]. See Harding Hospital, Inc. v. United States, 505 F.2d 1068, 1077 (6th Cir. 1974) [74-2 USTC P 9816] (Hospital's lack of "a specific plan or policy for the treatment of charity patients" was a factor for denying exemption under section **501 (c)(3)**).

D. Hospital's Activities Must Actually Produce a Community Benefit

A hospital will not qualify for exemption under the community benefit standard merely by stating that its policies are designed to provide health care services for the indigent. The operational test under section **501(c)(3)** obligates an organization to engage "primarily in activities which accomplish one or more" exempt purposes. Treas. Reg. §1.501(c)(3)-1(c)(1) (emphasis added). The hospital, therefore, must demonstrate that its charity care policies actually yield significant health care services to the indigent to qualify for exemption. See Redlands Surgical Services, 113 T.C. at 86-88 [CCH Dec. 35,459]; Geisinger Health Plan, 985 F.2d at 1219 [93-1 USTC P 50,583].

In Sound Health, the court stated that the policy behind the community benefit standard is "insuring that adequate health care services are actually delivered to those in the community who need them." 71 T.C. at 180-181 [CCH Dec. 53,519] (emphasis added). In Geisinger Health Plan, the third circuit overruled a determination by the Tax Court that a health maintenance organization qualified for exemption under the community benefit standard. 985 F.2d at 1221, rev'g and remanding, 62 T.C.M. (CCH) 1656 (1991) [CCH Dec. 47,840(M)]. The third circuit concluded that "the mere presence of the subsidized dues program" for the poor did not establish that the organization benefitted the community, because the amount of benefit the program actually conferred was minuscule. 985 F.2d at 1219-1220 [93-1 USTC P 50,583]. In Redlands, a surgery center argued that, by changing its policy for performing surgery "from an economic to exclusively a medical decision," it "achieved its goal of providing complete access to ... care for all members of the Redlands community irrespective of their ability to pay." 113 T.C. at 86 [CCH Dec. 35,459] (emphasis added). The court rejected this assertion, finding that the administrative record did not support the surgery center's claim that it actually provided any charity care. 113 T.C. at 86, 87 [CCH Dec. 35,459]. As further evidence of its charitable purposes, the surgery center stated that it had "no requirement that patients demonstrate an ability to pay before receiving treatment." 113 T.C. at 87 [CCH Dec. 35,459]. The court also rejected this claim, finding that the record contained no evidence that the organization had communicated this policy to its patients. 113 T.C. at 87 [CCH Dec. 35,519]. See Federation Pharmacy Services, Inc. v. Commissioner, 72 T.C. at 692 [CCH Dec. 36,198] (Organization denied exemption because it did not provide drugs for free or below cost to the indigent); Sonora Community Hospital, 46 T.C. at 524, 526 [CCH Dec. 28,053] (Hospital denied exemption because it provided only minimal charity care).

Based on the foregoing, a hospital's mere assertions that it has a policy to provide health care services to the indigent is not sufficient to establish that the hospital meets the charity care requirement of the community benefit standard. Instead, the hospital also must show that it actually provided significant health care services to the indigent.

CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS

Set forth below are a series of questions to address when developing the factual record on the charitable care policies and activities of a hospital.

1. Does the hospital have a specific, written plan or policy to provide free or low-cost health care services to the poor or indigent?

2. Under what circumstances may, or has, the hospital deviated for its stated policies on providing free or low-cost health care services to the poor or indigent?

3. Does the hospital broadcast the terms and conditions of its charity care policy to the public?

4. Does the hospital maintain and operate a full-time emergency room open to all persons

regardless of their ability to pay?

5. What directives or instructions does the hospital provide to ambulance services about bringing poor or indigent patients to its emergency room?

6. What inpatient, outpatient, and diagnostic services does the hospital actually provide to the poor or indigent for free or for reduced charges?

7. Under what circumstances does the hospital deny health care services to the poor or indigent?

8. Does the hospital operate with the expectation of receiving full payment from all persons to whom it renders services?

9. How and when does the hospital ascertain whether a patient will be able to pay for the hospital's services?

10. What documents or agreements does the hospital require poor or indigent patients to sign before receiving care?

11. What is the hospital's policy on admitting poor or indigent patients as inpatients and outpatients?

12. Under what circumstances does the hospital refer poor or indigent individuals who require services to other hospitals in the area that do admit poor or indigent patients?

13. Does the hospital maintain separate and detailed records about the number of times, and circumstances under which, it actually provided free or reduced-cost care to the poor or indigent?

14. Does the hospital maintain a separate account on its books that segregates the costs of providing free or reduced-cost care to the poor or indigent? Does this account include any other items, such as write-offs for care to patients who were not poor or indigent?

If you have any further questions, please call Don Spellmann at (202) 622-6010.

Assistant Chief Counsel (Exempt Organizations/Employment Tax/Government Entities), Elizabeth Purcell, Branch Chief, Exempt Organizations, Branch 2.

Source: Legal > Secondary Legal > CCH > Taxation - Federal > IRS Releases > $ CCH Field Service Advice 🖫
Terms: ("501(c)(3)")  (Edit Search)
View: Full
Date/Time: Friday, October 29, 2004 - 10:41 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Keith M. Fleischman (KF-0199)
Francis P. Karam (FK-8288)
Ronald J. Aranoff (RA-4690)
Anne W. Salisbury (AS-7333)
10 East 40th Street, 22nd Floor
New York, New York 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**Attorneys for Plaintiffs**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

SANDRA CARLSON and MARJORIE CUMMINGS,  :
on Behalf of Themselves and All Others Similarly  :
Situated,  :
    :
    :
                       Plaintiffs,  :
    :  Index No. CV-04-3086
           v.  :  (LDW)(ARL)
    :
LONG ISLAND JEWISH MEDICAL CENTER,  :
NORTH SHORE UNIVERSITY HOSPITAL IN  :
MANHASSET, NORTH SHORE-LONG ISLAND  :
JEWISH HEALTH SYSTEM, INC., AMERICAN  :
HOSPITAL ASSOCIATION, AND JOHN DOES 1-10,  :
    :
                    Defendants.  :

------------------------------------------------------------------------ x

## CERTIFICATE OF SERVICE

I, Anne w. Salisbury, hereby certify and affirm this 19th day of November 2004,

copies of the **Plaintiffs' Memorandum Of Law in Opposition to Defendant North**

**Shore-Long Island Jewish Health System, Inc., Long Island Jewish Medical Center**

**and North Shore University Hospital in Manhasset's Motion to Dismiss The**

**Complaint,** were served via electronic mail delivery and Federal Express, on the

following interested parties:

Robert S. Fischler, Esq..
Winston & Strawn LLP,
200 Park Avenue,
New York, NY  10166

Catherine E. Stetson, Esq.
Hogan & Hartson L.L.P.,
555 13th Street, N.W.,
Washington, DC  20004-1109

I certify under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2004

Anne W. Salisbury